UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| VS | ) | Dkt. No. 1:25-cr-00021-MSM |
| | ) | |
| EDWARD ANTONIO REYES CALDERON | ) | |

# EDWARD ANTONIO REYES CALDERON'S SENTENCING MEMORANDUM



"When my daughter was born, I promised her that I would never leave her and
that I would always be with her. I know because of this mistake I made;
I have taken myself out of her life. … I held her for the first and last time the
day she was born. … I want to get back to Venezuela and help my wife and daughter get
back there too so I can hold my child again."

– Letter from Edward Antonio Reyes Calderon to the Court, attached as Exhibit 1).

## Mr. Reyes Calderon's History and Characteristics

Edward Antonio Reyes Calderon is a twenty-three-year-old immigrant from Venezuela. He came to the United States in December 2023 with his fiancé to forge a better future. After arriving here, he sought asylum from the gang violence that nearly cost him his life in his home country. After entering the U.S. through Texas, the young couple shuttled between Rhode Island and New York.[1] Since arriving in America, Mr. Reyes Calderon has worked long hours in construction. He and his wife were preparing to raise their first child before his arrest.[2] Mr. Reyes Calderon was taken by ICE on February 13, 2025, just a few days after the birth of his daughter.[3] There were complications; she swallowed amniotic fluid during delivery and was quickly transferred to the NICU (neonatal intensive care unit) at the hospital.[4] As a result, Mr. Reyes Calderon has not held his child since the day she was born.[5] Mr. Reyes Calderon's daughter is pictured above as a newborn (left) and in a more recent photograph at six months of age (right).

Mr. Reyes Calderon was raised in Venezuela by his mother until it became too dangerous for her to live there; he was fourteen years old when she left him.[6] He was told that his father had abandoned their family while his mother was pregnant with him. He did not meet the man until he was 10 years old.[7] They do not have a relationship today. In his pre-sentence interview,

---

[1] *See Presentence Investigation Report* (PSR) at 9 (July 30, 2025).
[2] *Id.* at 10-11.
[3] *Id.*
[4] A premature baby swallowing amniotic fluid at birth, particularly if it contains meconium (fetal stool), can lead to Meconium Aspiration Syndrome (MAS). MAS occurs when a newborn inhales this mixture, potentially causing breathing difficulties, lung inflammation, and low oxygen levels. While most babies recover within a few days, severe cases can lead to complications like persistent pulmonary hypertension or brain damage due to oxygen deprivation. https://www.merckmanuals.com/home/children-s-health-issues/lung-and-breathing-problems-in-newborns/meconium-aspiration-syndrome
[5] *Id.*; *see also Letter from Edward Reyes Calderon to Judge McElroy*.
[6] *See PSR* at 8.
[7] *Id.*

Mr. Reyes Calderon explained that his mother received subsidized housing from the Venezuelan government; the apartment was in a high-crime neighborhood in Caracas.[8] Eventually, a Venezuelan gang took control of the building they lived in. The gang demanded that Mr. Reyes Calderon's mother start paying them protection money to live there and to continue operating her small business.[9] When she refused, they threatened her life. She fled to Peru for her safety, leaving her teenage son in Venezuela in the care of his grandmother. (Mr. Reyes Calderon's Alien or A-File attached, under seal, as Exhibit 2).

Mr. Reyes Calderon became the gang's target after his mother escaped to Peru. The gang attacked and shot him: "[M]embers of the gang surrounded me on my way home. They wanted to know where my mother was and they threatened to kill her. As I did not provide the response they wanted, one of them shot me twice on [sic] the right leg and left me for dead."[10] He was 14 years old when he was shot.[11] He dropped out of school and the highest grade level he completed was equivalent to the ninth grade.[12]

Mr. Reyes Calderon's story is unfortunately shared by many other immigrants who are forced to flee their home countries. According to the Institute for Economics & Peace and their 2025 Global Peace Index (GPI) Report, Venezuela is one of the most dangerous countries in the world (ranked at 139/163 states in the GPI).[13] For reference, other similarly-ranked countries

---

[8] *Id.*
[9] *Id.*
[10] *See Edward Antonio Reyes Calderon A-File* at 48.
[11] *See PSR* at 8.
[12] *Id.* at 10.
[13] *Global Peace Index 2025: Identifying and Measuring the Factors that Drive Peace*, Sydney, Institute for Economics & Peace (June 2025), *available at* https://www.visionofhumanity.org/wp-content/uploads/2025/06/Global-Peace-Index-2025-web.pdf at 8-9. By way of background, the GPI ranks "163 independent states and territories according to their level of peacefulness." *Id.* at 2. A country's ranking is determined by "23 qualitative and quantitative indicators … across three domains: the level of *Societal Safety and Security*; the extent of *Ongoing Domestic and International Conflict*; and the degree of *Militarisation*." *Id.* at 2 (emphasis in original).

include Ethiopia (#138), Iran (#142), and Palestine (#145).[14] Regionally, Venezuela is the second-most dangerous country in South America, behind Colombia.[15] The Report states that Venezuela "recorded the largest deterioration in the region in the past year. … *Deaths from internal conflict* rose … with *political instability* also deteriorating …"[16] Furthermore, "[a]s of mid-2024, over half of all refugees under the UN Refugee Agency's mandate come from just four countries: Afghanistan, Syria, Ukraine, and Venezuela."[17]

      Mr. Reyes Calderon entered the U.S. in December 2023 near El Paso, Texas. He was held in ICE custody and released with a date to appear for a removal proceeding on June 15, 2027.[18] Mr. Reyes Calderon intended to go to his sister's home in Addison, Illinois and gave that address to immigration authorities, but decided to head east instead. In New York, he filed an Application for Asylum with the assistance of the NYC Asylum Application Help Center at the American Red Cross.[19] He also filed a change of address form, providing his Manhattan address.[20] In his application, he explained that he and his family have been targeted by the Wilexis gang.[21] This "mega-gang" is named after Wilexis Alexander Acevedo Monasterios, "one of Venezuela's most wanted criminals."[22] Before Wilexis' recent death in January 2025, he led the mega-gang, which was "dedicated to kidnappings, robberies, and contract killings. … [it] focused on extorting formal and informal traders in the area. … [and] [a]t one point, kidnapping was one of the gang's most thriving economies."[23]

---

[14] *Id.* at 9.
[15] *Id.* at 17.
[16] *Id.* (emphasis in original).
[17] *Id.* at 33.
[18] *See A-File* at 55.
[19] *See A-File* at 37.
[20] *See A-File* at 50.
[21] *Id.*
[22] *Wilexis Alexander Acevedo Monasterios, alias 'Wilexis'*, InSight Crime (Jan. 31, 2025), *available at* https://insightcrime.org/venezuela-organized-crime-news/wilexis-alexander-acevedo-monasterios-alias-wilexis/.
[23] *Id.*

Mr. Reyes Calderon wrote in his asylum application, "I fear that I will be killed if I return to Venezuela. … The Government is unable or unwilling to protect the population …"[24] Tellingly, Mr. Reyes Calderon is willing to take that risk if it means being reunited with his wife and baby.[25] His goal is to make it to Peru to see his mother for the first time in many years after his family in Venezuela helps him get back on his feet.[26] Mr. Reyes Calderon's status as a "deportable alien" is relevant here and may be taken into consideration by the Court.[27]

Mr. Reyes Calderon was arrested three times in 2024. He was arrested by Providence Police after an argument with his housemate, who accused the defendant of keying his car (Case No. 61-2025-01239). Because the two men lived under the same roof, it was charged as Domestic Violence Vandalism, First Offense. He was also arrested in New York City for shoplifting (petit larceny) at Bloomingdales on two occasions and referred to the Manhattan Justice Opportunities (MJO) alternative to incarceration program.[28]

Mr. Reyes Calderon was released on his own recognizance and given dates to appear in late February of 2025 by the judges in all three cases. Warrants were issued in each case, however, because he was in ICE custody. The defendant would like to return to Venezuela as soon as possible to be reunited with his wife and their infant daughter, despite the dangers he faces there. These warrants may further delay this objective.

---

[24] *A-File* at 41.
[25] *See Letter to Judge McElroy*.
[26] *Id.*
[27] "[W]e now hold that a sentencing court has the discretion, in an appropriate case, to weigh the possibility of future deportation when mulling the section 3553(a) factors in an effort to fashion a condign sentence. Under appropriate circumstances, a defendant's potential deportation may properly be considered as part of a broader assessment of his history and characteristics …" *United States v. Hercules*, 947 F.3d 3, 9 (1st Cir. 2020) (footnote omitted).
[28] Manhattan Justice provides community-based alternative sentencing options to reduce the use of incarceration and criminal convictions for people charged with misdemeanors and felonies. https://www.innovatingjustice.org/program/manhattan-justice-opportunities/

### **Mr. Reyes Calderon Is Not Affiliated with Any Gang Activity**

Buried in Mr. Reyes Calderon's A-File is an unsubstantiated claim that he is a gang member.[29] A Department of Homeland Security (DHS) form within the file states that "a[n unnamed] Seargent with the Rhode Island Sherrif's department made [statements] to SDDO Lenihan that he overheard Reyes state he was in a gang in Chicago; [and that] Reyes has lived in Chicago, IL …"[30]

First, while Mr. Reyes Calderon does have family members who live thirty minutes outside of Chicago, he himself has never lived there.[31] Since entering the U.S. in December 2023, he has only lived in three states: Texas, New York, and Rhode Island.[32] Chicago is otherwise mentioned in Mr. Reyes Calderon's A-File in reference to DHS being served his Application for Asylum at their Chicago office for the Principal Legal Advisor.[33]

To be clear, Mr. Reyes Calderon asserts and reaffirms that he is **not** a gang member – he told law enforcement as much several times: "Reyes repeatedly denied that he had any gang involvement."[34] Despite this, DHS is convinced that there are "several indicators that he may in fact be a gang member."[35] One of them is the baseless quote detailed above from a nameless Sergeant who told an agent who told the report writer that Reyes was connected to a gang. The other "indicator" is that Reyes has "multiple tattoos" – but DHS itself recognizes that he "does not have commonly seen Tren de Aragua tattoos."[36]

---

[29] *See A-File* at 6.
[30] *Id.*
[31] *See PSR* at 9.
[32] *Id.*
[33] *See A-File* at 49, 50, and 52.
[34] *Id.* at 6.
[35] *Id.*
[36] *Id.* Tren de Aragua is "a Venezuelan gang that President Trump is targeting in his latest wave of deportations…" John Otis, *Tren de Aragua – all you need to know about the Venezuelan gang*, NPR (Mar. 16, 2025), *available at* https://www.npr.org/2025/03/16/nx-s1-5329777/tren-de-aragua-all-you-need-to-know-about-the-venezuelan-gang.

This portion of DHS's report is concerning considering the massive influx in deportations where those deported – mostly Venezuelans – have not received due process.[37] Rather, hundreds of people have been "accused – without evidence – of being members of Venezuelan gang Tren de Aragua" and then flown to a mega-prison in El Salvador that has been described as "hell on Earth."[38]



In this photo provided by El Salvador's presidential press office, prison guards transfer deportees from the U.S., alleged to be Venezuelan gang members, to the Terrorism Confinement Center in Tecoluca, El Salvador, Sunday, March 16, 2025.  - *AP/El Salvador presidential press office*

U.S. law enforcement and immigration agencies have increasingly relied on tattoos to determine gang membership.[39] Lawyers for some of the Venezuelan immigrants who were flown

---

[37] Sergio Martinez-Beltran and Manuel Rueda, *'Hell on Earth': Venezuelans deported to El Salvador mega-prison tell of brutal abuse*, NPR (July 27, 2025), *available at* http://npr.org/2025/07/27/nx-s1-5479143/hell-on-earth-venezuelans-deported-to-el-salvador-mega-prison-tell-of-brutal-abuse.
[38] *Id.*
[39] Tim Sullivan, *Everyday tattoos got Venezuelan men ID'd as gang members and deported, lawyers say*, AP News (March 20, 2025), *available at* https://apnews.com/article/gang-deportation-trump-tattoos-c0bd5c4b76ac01d2c75b043caea14da0.

to El Salvador "said that at least five of them … were apprehended in part because they had tattoos that federal immigration agents claimed indicated ties to Tren de Aragua."[40]

While Mr. Reyes Calderon has tattoos, none of them are symbols that are typically associated with Tren de Aragua.[41] As he explained to probation, his tattoos include his nickname; his mother's name; his family's initials; the name of a niece; and a clown playing cards.[42]

Moreover, tattoos are not – nor should they be treated as – indicative of a person's gang affiliation. An expert on Venezuelan gangs stated, "Venezuelan gangs are not identified by tattoos" and "[they] pointed out that as in all parts of the world, the only way to determine that a person is a delinquent or criminal is 'to conduct a police investigation' and 'grant them due process'."[43]

**18 U.S.C. § 3553(a)**

Mr. Reyes Calderon, by and through undersigned counsel, submits this Memorandum to assist the Court in determining a sentence that is "sufficient but not greater than necessary" to effectuate the statutory purposes of sentencing.[44] Mr. Reyes Calderon asks that the Court impose a sentence of time served. This proposed sentence adequately addresses society's need for punishment and deterrence, without wasting limited government resources by continuing to incarcerate a person that the government is seeking to deport in any event.[45]

---

[40] Alan Feuer, *Administration's Details on Deportation Flights 'Woefully Insufficient,' Judge Says*, The New York Times (March 20, 2025), *available at* https://www.nytimes.com/2025/03/20/us/politics/trump-deportation-venezuela-tren-de-aragua.html?partner=slack&smid=sl-share.
[41] Nicole Acevedo, Deon J. Hampton, and David Noriega, *Tattoos of deported Venezuelans don't necessarily signal gang affiliation, experts say*, NBC News (March 21, 2025), *available at* https://www.nbcnews.com/news/latino/tattoos-deported-venezuelans-not-necessarily-gang-members-rcna197089.
[42] *See PSR* at 9.
[43] Acevedo, *Tattoos of deported Venezuelans don't necessarily signal gang affiliation, experts say*, NBC News (March 21, 2025).
[44] 18 U.S.C. § 3553(a).
[45] An Immigration detainer was issued for Mr. Reyes Calderon on March 6, 2025. *See PSR* at 1.

When imposing a sentence, the Court must consider the factors enumerated in 18 U.S.C. § 3553(a), which include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range …
>
> (5) any pertinent policy statement …
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.[46]

These factors must be considered in concert with the defendant's advisory sentencing guideline. However, Courts are permitted to evaluate whether a sentencing guideline accurately reflects an appropriate sentence for the individual in front of them.[47] "It is the sentencing court's prerogative—indeed, its duty—to 'draw upon [its] familiarity with a case, weigh the factors enumerated in [section] 3553(a), and custom-tailor an appropriate sentence.'"[48]

Here, the advisory guideline is 12 to 18 months, based on an adjusted offense level of 13 and a criminal history category of I.[49] Mr. Reyes Calderon has been in federal custody since his

---

[46] § 3553(a).
[47] *See Kimbrough v. United States*, 552 U.S. 85 (2007).
[48] *United States v. Ortiz-Pérez*, 30 F.4th 107, 112 (1st Cir. 2022) (alterations in original) (quoting *United States v. Flores-Machciote*, 706 F.3d 16, 20 (1st Cir. 2013)).
[49] *See PSR* at 11.

arrest by ICE on February 13, 2025.[50] He posits that the factors laid out in § 3553(a) support a downward variance from this proposed range, to a sentence of time served.

**The Nature and Circumstances of the Offense**

Mr. Reyes Calderon comes before the Court for sentencing on one count of Resisting Arrest of a Federal Officer, 18 U.S.C. § 111(a)(1).[51] This offense is broadly defined as "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with" here, a federal officer, "while [they are] engaged in or on account of the performance of official duties."[52] It follows, then, that some conduct covered by this statute will be more severe, more violent, when compared to that of identically charged defendants.

Mr. Reyes Calderon was described as "pushing and pulling"[53] the officers. He "began to flex and pull away, becoming very aggressive and violently resisting [the] officers."[54] However, there is no indication that Mr. Reyes Calderon hit, bit, struck, stabbed, punched, spit on, kicked at, or came into any other kind of physical contact with the officers that would also be logically covered by 18 U.S.C. § 111(a)(1) and U.S.S.G. § 2A2.4(b)(1)(A).[55]

Mr. Reyes Calderon resisted arrest by pushing and pulling away from the ICE agents when they seized him. He flexed his wrists and was eventually brought to the ground. It is alleged that the defendant grabbed an officer's waistband as he was brought to his feet. This action led to an assumption by law enforcement that he was reaching for a firearm. As was the case at his change of plea hearing, Mr. Reyes Calderon categorically denies this accusation.

---

[50] *See Criminal Complaint* (Feb. 13, 2025).
[51] *Edward Antonio Reyes Calderon Information* at 1 (March 12, 2025).
[52] 18 U.S.C. § 111(a)(1).
[53] *Information* at 1.
[54] *PSR* at 5.
[55] "Physical contact" is not defined in the U.S.S.G.

The PSR recommends a 3-level increase of the base offense level, pursuant to U.S.S.G. § 2A2.4(b)(1)(A), because the offense involved physical contact.[56] However, this indiscriminate 3-level increase does not contemplate the spectrum of physical contact that can occur in these scenarios. Mr. Reyes Calderon's sentence should be tailored to reflect his specific behavior.

In addition, the severity of any resultant bodily injury is not contemplated by U.S.S.G. § 2A2.4(b)(2), beyond that the guideline does not include *serious* or permanent/life-threatening bodily injury, as that would be evaluated under the U.S.S.G. § 2A2.2(b)(3) Aggravated Assault Guideline. The Guidelines define bodily injury as "any significant injury; e.g. an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought."[57] Like physical contact, bodily injury can include a wide range of outcomes. Here, there is no indication of what types of injuries the two officers received, beyond that they were "minor" and "required evaluation at the local hospital."[58] Therefore, as long as an injury does not reach the level of "serious," but meets the minimal definition outlined by the Guidelines, it satisfies another indiscriminate 2-level increase of the base offense level.

The defendant's conduct in this case establishes the elements of the offense, and he accepted responsibility for his actions by pleading guilty to this information a month after his initial appearance. The guideline enhancements for physical contact and minor injury to officers, who were evaluated medically and cleared, are properly applied as well. However, the guideline enhancements, like the statute itself, necessarily encompass a wide range of behavior. Mr. Reyes Calderon's actions undoubtedly fall on the lower end of that spectrum and his sentence should reflect this.

---

[56] *See PSR* at 5.
[57] *United States Sentencing Guidelines Manual §1B1.1* at 18 (Nov. 1, 2024).
[58] *PSR* at 5.

**The Need to Protect the Public**

Although 18 U.S.C. § 111(a)(1) offenses are considered crimes of violence, the details of this offense reveal that such a label is not fully accurate here. Mr. Reyes Calderon's illegal behavior involved failing to peacefully submit to officers who surrounded him and arrested him minutes after he was told by a different government official that he was free to leave.[59] While his behavior was certainly improper and illegal, one may understand how someone from his background (a young man who grew up in a neighborhood run by a mega-gang that profited off of kidnapping people) and in his situation (a new father who had left his wife and baby at the NICU) reacted the way that he did.

Notably, in cases where the defendant is a "deportable alien," the First Circuit has held that their status is relevant when determining whether a sentence will adequately protect the public from future crimes: "Future threats to the community might conceivably be mitigated in a situation in which, upon release from imprisonment, the defendant will promptly be deported. *Cf. United States v. Morales-Uribe*, 470 F.3d 1282, 1287 (8th Cir. 2006) (making this point but concluding that defendant's impending deportation 'would not support a substantial downward variance' on this basis since defendant had thrice attempted unlawful entry)."[60]

**Conclusion**

Mr. Reyes Calderon is asking the Court for a time served sentence. A prison sentence for him serves no purpose. Setting aside the human costs of this situation, a prison sentence for Mr. Reyes Calderon would only continue to consume resources that the government itself does not want to spend on him – it is admittedly seeking to deport him as soon as possible. Being

---

[59] *See Letter to Judge McElroy* ("When the judge told me I was free to go and gave me my next court date I was happy because I knew I could go straight to the hospital to see my wife and baby.")
[60] *Hercules*, 947 F.3d 3, 9.

separated from his daughter days after she was born and now facing deportation with no guarantee of when he will see her and his wife again, is punishment enough. A time served sentence is sufficient but no longer than necessary in this case.

Respectfully submitted,

EDWARD ANTONIO REYES CALDERON

By his attorney,

*/s/ Joanne M. Daley*
Joanne M. Daley, BBO #653375
Assistant Federal Defender
10 Weybosset St., Ste. 300
Providence, RI 02903
(401) 528-4281
FAX 528-4285
joanne_daley@fd.org

## CERTIFICATION

I hereby certify that a copy of this motion was delivered by electronic notification to Peter Roklan and Taylor Dean, Assistant United States Attorneys on August 3, 2025.

*/s/ Joanne M. Daley*